IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA SEAMON, individually, and as personal representative of the estate of KENNETH SEAMON, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:12-CV-895-WKW [WO] |
| REMINGTON ARMS COMPANY, LLC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Tragically, Kenneth Seamon died from a gunshot wound to the chest inflicted by his own Remington 700 rifle while he was hunting alone from a deer stand thirteen-feet high in a tree. The rifle was found on the ground beneath the unfortunate hunter, with a rope tied to the barrel, a spent shell in the chamber, and the safety "off" (in the "fire" position). The issue is what caused the rifle to fire. All the available evidence suggests nothing as to causation; the circumstances of Mr. Seamon's death defy reasoned explanation, and perhaps, logic. The facts test the thin line between speculation and reasonable inference. Plaintiff Cynthia Seamon fails to cross the evidentiary line into reasonable inference of causation, and her case must fail.

Plaintiff, individually and as the personal representative of her deceased husband's estate, brings this action against Defendant Remington Arms Company, LLC ("Remington").  She alleges that her husband died as a result of a defect in a Remington Model 700 bolt-action rifle that caused the rifle to fire without a trigger pull.  Before the court are three motions:  (1) Plaintiff's Motion for Partial Summary Judgment on the basis of offensive collateral estoppel (Doc. # 31); (2) Remington's Motion to Exclude the Causation Opinion of Plaintiff's Liability Expert pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (Doc. # 34); and (3) Remington's Motion for Summary Judgment on grounds that, if the expert testimony is excluded, summary judgment in favor of Remington is warranted (Doc. # 34).  The parties have fully briefed the motions. (Docs. # 38, 40, 44.)  After careful consideration of the arguments of counsel, the law, and the evidence, the court finds that Plaintiff's motion for summary judgment is due to be denied, that Remington's *Daubert* motion is due to be granted,[1] and that Remington's summary judgment motion is due to be granted.

## I. JURISDICTION AND VENUE

The court exercises diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a).  The parties do not contest personal jurisdiction or venue.

---

[1] No hearing has been requested on the *Daubert* motion, and the record is adequate for a ruling without a hearing.

## II.  STANDARDS OF REVIEW

### A.    <u>Summary Judgment Standard</u>

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a

genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.   A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

**B.**   ***Daubert* Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert* and its progeny.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  The testimony is based on sufficient facts or data
> (c)  The testimony is the product of reliable principles and methods; and
> (d)  The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court emphasized that Rule 702 assigns the trial court a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."   509 U.S. at 589 & 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand.'" (quoting

*Daubert*, 509 U.S. at 596)).   This gatekeeping responsibility is the same when the trial court is considering the admissibility of testimony based upon "'technical' and 'other specialized knowledge.'"   *Kumho Tire*, 526 U.S. at 141 (quoting Fed. R. Evid. 702).

In light of *Daubert*'s "gatekeeping requirement," the Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether:  "(1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999)).   These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs.   *See id.*   "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion," *id.*, and the proponent must meet its burden by a preponderance of the evidence.   *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (In addition, we note that "[t]he burden of laying the proper foundation for the

admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." (citing *Daubert*, 509 U.S. at 592, n.10)).

As to qualifications, "experts may be qualified in various ways," including by scientific training, education, and experience. *Frazier*, 387 F.3d at 1260. When evaluating the reliability of scientific expert testimony, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. Factors that may bear on the reliability of expert testimony include (1) whether the expert's theory can be and has been tested, (2) whether the theory has been subjected to peer review and publication, (3) whether the known or potential rate of error of the methodology is acceptable, and (4) whether the theory is generally accepted in the proper scientific community. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94). These factors are not definitive, however. Other potentially relevant factors, depending upon the facts, include "whether the proposed expert ruled out other alternative explanations" and "whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (collecting cases). In short, trial courts retain "considerable leeway in deciding in a particular

case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.  At the same time, trial courts must remain mindful that "*Daubert* does not require certainty; it requires only reliability."  *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198 n.10 (11th Cir. 2010).  The focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

Finally, whether the expert testimony will assist the trier of fact in understanding the evidence or a fact in issue "goes primarily to relevance."  *Id.* at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (citation and internal quotation marks omitted).  "The 'basic standard of relevance . . . is a liberal one,' but if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'"  *Boca Raton Cmty. Hosp.*, 582 F.3d at 1232 (quoting *Daubert*, 509 U.S. at 591–92).   Hence, under this third inquiry, "even if an expert's testimony [is] admissible under the first two prongs of the *Daubert* analysis, it may still be insufficient to create an issue of fact to overcome summary judgment." *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1232 (N.D. Ala. 2011); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (District courts may reject expert testimony that is based on

sound methodology when "there is simply too great an analytical gap between the data and the opinion proffered.").

In the end, the court's gatekeeping role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). Where the basis of expert testimony satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III. BACKGROUND

A.  <u>**The Parties**</u>

Plaintiff Cynthia Seamon is the widow of Kenneth Seamon and the personal representative of his estate. Although the pleadings focus on the citizenship of Ms. Seamon,[2] the summary judgment record contains sufficient evidence demonstrating that that Mr. Seamon was an Alabama citizen, and the parties have not contended otherwise.

Defendant Remington Arms Company, LLC ("Remington") is a Delaware Corporation, engaged in the business of designing, manufacturing, assembling, distributing, and selling firearms. Among the firearms Remington makes is the

---

[2] The First Amended Complaint identifies Plaintiff's citizenship, but the relevant citizenship is that of the decedent, not his legal representative. *See* 28 U.S.C. § 1332(c)(2) ("[T]he legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent . . . .").

Remington Model 700 Bolt-Action Rifle ("M700").  The M700 rifle is at issue in this case.

## B.   **The M700 Rifle**

### 1. *Background and Relevant Mechanics*

In 1962, Remington introduced the M700 rifle, and to date, nearly five million have been sold to the public.  The M700 rifle is a manually operated firearm and, as the name indicates, uses a bolt-action mechanism.  This means that the opening and closing of the breech or chamber is operated manually by a bolt. Originally patented in 1948 by Merle H. Walker and Philip R. Haskell, the M700 has a trigger assembly, often referred to as the Walker fire control, consisting of the trigger, connector, sear, safety, and firing pin assembly.  (*See* Charles Powell's Expert Report, at 3–5.)

The trigger is lever-style.  The connector, or trigger connector as it is sometimes called, is an internal component of the firing mechanism that is set into motion when the trigger is pulled.  The connector is not attached to the trigger, but is a slip fit.  The connector is pushed into contact with the front of the trigger by the trigger spring. Pressing the trigger initiates movement of the connector, pushing it forward out from under the sear.  The connector movement then causes the sear to fall down along with the spring force of the firing pin head, causing the chambered round to fire.  (*See* Diagram, Doc. # 34, at 5.)

Important in this case is the amount of space between the sear and the connector. This is called "sear engagement" or "connector engagement." As Plaintiff's expert, Charles Powell, opines, if the sear engagement is too low, then the trigger assembly becomes overly sensitive, resulting in possible sear engagement without the pull of the trigger. (*See* Powell's Report, at 4–5, 53–56.) A sear engagement between .020 and .030 of an inch is considered to be "a safe and secure sear engagement and will not fire without a trigger pull." (*See* Diagram, Doc. # 34, at 4, 5.) However, when the sear engagement is smaller, the rifle can discharge without the pull of a trigger if the rifle is bumped, dropped, or hit.

The safety mechanism, when set to the "safe" or "on" position, is designed to prevent the accidental or unintended discharge of a firearm. The M700 rifle uses an external, manual safety. When the safety is in the "safe" or "on" position, the safety arm raises the sear and holds it in place above the connector. (*See* Diagram, Doc. # 34, at 5.) When the safety is moved to the "off" or "fire" position and the rifle is cocked, the top of the connector supports the sear.

### 2.    *The M700 Rifle at Issue*

The M700 rifle at issue was manufactured by Remington in 2003 and purchased new by Plaintiff and her deceased husband in 2004. The rifle was used

for deer hunting.   The M700 rifle is a 7mm-08 Bolt-Action Rifle, Serial No. G6318499.

**C.   Facts Surrounding the Tragic Shooting Death of Plaintiff's Husband**

On November 26, 2011, the Saturday after Thanksgiving, in Autauga County, Alabama, Plaintiff's husband, Kenneth Seamon, was killed by a gunshot wound to the chest from his M700 rifle while deer hunting from a tree stand. There were no eye witnesses.  When he was found, Mr. Seamon was in an elevated tree stand with his right hand in a "grasping position."  The rifle was on the ground some thirteen feet below, and a lanyard or "pull rope" was attached to the rifle by two carabiners.  The other end of the lanyard was attached to the tree stand.  There is one report documenting that "the rope was wrapped or tangled around the scope and also the safety mechanism."   (Grady Myers's Investigative Synopsis, at 1 (Doc. # 34-3).)  The safety was in the "fire" or "off" position, and a spent cartridge casing was in the rifle's chamber.  There was no "gunshot residue" found on Mr. Seamon or his clothing "as would be [found in] a close contact wound."  (Officer Jerry McMichael's Dep., at 76–77 (Doc. # 40-7).)

**D.   The Testimony of Plaintiff's Expert, Charles Powell**

Plaintiff's liability expert is Charles Powell ("Powell"), a proposed expert in the field of metallurgical engineering.   Mr. Powell conducted physical examinations of the M700 rifle at issue, including x-ray computer tomography and

performed a series of fire-control function tests on the rifle (*e.g.*, the fire-on-safety-release test, "fire on bolt closing or fire on bolt opening" test, safety-function test, and trigger-function test), and a trick test.  Remington's expert, Derek Watkins, performed the same tests on the rifle, and it is undisputed that the rifle passed the fire-control-function tests and the trick test when performed by both experts.[3]  It also is undisputed that, during testing, the only way Mr. Powell could make the rifle fire was by pulling the trigger when the safety was in the "off" position, which is the manner in which the rifle was designed to function.

Notwithstanding that the firearm passed these particular tests and fired as designed with the pull of the trigger, Mr. Powell formed an opinion that, on the day in question, the rifle fired without the pull of the trigger as a result of a design defect in the Walker trigger.  The alleged defect is the inclusion of the connector in the design of the rifle's trigger mechanism.  (Powell's Report, at § 6.3.)  "The inadvertent firings of Remington rifles with a Walker fire control design, like the subject rifle, occur because this fire control design includes a Connector that does not reliably return to full engagement with the Sear each time the rifle bolt is cocked." (Powell's Report, at § 6.12.)  Mr. Powell contends that this known defect allows unspecified debris or contaminants inside the trigger mechanism, thereby

---

[3] Mr. Powell and Mr. Watkins elaborate on the nature of these tests in their expert reports, and additionally, Mr. Powell expounds upon the various tests in his deposition.

reducing the amount of sear engagement below the safe range of between .020 and

.030 of an inch.[4]   As to the rifle at issue, Mr. Powell opines that deposits of dirt and

lubricants were between either the connector and the sides of the fire control

housing or between the trigger and the connector.   Mr. Powell explains:

> Upon disassembly and examination of the subject rifle, particles and
> deposits were noted on the outside and inside of the fire control
> mechanism.   These are the types of deposits that have been shown to
> be sources of interferences for the connector sear engagement,
> reducing its value at the time of the firing of the subject rifle during its
> use by Mr. Seamon.

(Powell's Report, at §§ 6.3.1–6.4; *see also* Powell's Dep., at 42 (explaining that the

deposits on the subject rifle were lubricant and dirt deposits).)   He explains that

these deposits "displace[d] the connector away from the trigger body," keeping

"the connector at a low engagement" of .007 of an inch or less.   (Powell's Dep.,

at 42–44, 76; Powell's Report, at §§ 6.3.1, 6.4.)   He opines that this low

engagement allowed the rifle to fire without a trigger pull as a result of a "jar-off."[5]

---

[4] According to Mr. Powell's report, the rifle's connector floats on top of the trigger body inside the firearm, but is not bound to it.   When the trigger is pulled, the connector is pushed forward, allowing the sear to fall and fire the rifle. And "[e]very time the rifle is fired, the connector snaps forward, leaving a small gap between the trigger body and the Connector rear surface."   (Powell's Report, at § 6.3.)   "Slow motion video has shown that, as a rifle is fired, the Connector also whips back and forth from the trigger surface due to rifle movement generated forces."   (Powell's Report, at § 6.2.)   According to Mr. Powell, dirt and debris can then become lodged in the space created between the connector and the trigger, preventing the connector from returning to its original position. This results in precipitous engagement of the connector and sear – a condition that Mr. Powell concludes causes the rifle to fire, without pulling the trigger, when it is jarred.

[5] The opinions of Derek Watkins, Remington's expert, are not subject to a *Daubert* challenge.   It is noted, however, that, contrary to Mr. Powell's opinions, Mr. Watkins opines that

Mr. Powell believes that the "jar-off" firing as to the subject rifle was caused by "external forces acting on the rifle while Mr. Seamon was seated in his tree stand," such as by "contact between the subject rifle and the tree, the pull rope, and the ground if the rifle fell." (Powell's Report, at § 6.3.1.)

Mr. Powell concedes that exactly how the rifle discharged without a trigger pull is unknown; however, he is unaware of "any evidence that the trigger was pulled," and his review of documents did not reveal "anything that would have grabbed the trigger as [Mr. Seamon] was raising or lowering the rifle." (Powell's Dep., at 98.)  Mr. Powell also concedes that the rifle did not fail a jar-off test. During his deposition, he confirmed that "rapidly opening and closing the bolt with the safety off" is part of the jar-off test (Powell's Dep., at 29), and the rifle did not fail that test.  Another type of jar-off test, which Mr. Powell did not perform on the subject rifle, involves, in its simplest terms, cocking the rifle and dropping it or hitting it with a pendulum.  (Powell's Dep., at 29–30.)  Mr. Powell did not conduct this type of jar-off test on the rifle because, during his inspection, he did not observe a "continuous low [sear] engagement."  (Powell's Dep., at 29.)   Mr. Powell believes that, on the date of the shooting death, the precipitously low sear engagement was caused by the presence of debris and oil deposits, but that by the

---

"no manufacturing or design defects exist in the subject M700 rifle," that "[d]uring repeated testing and functions of the subject M700 rifle, the rifle would not fire absent a trigger pull," and that "the subject M700 rifle fired at the time of the shooting because it was loaded, cocked, the safety was in the 'Fire' position and the trigger was pulled." (Watkins's Report, at 26.)

time he received the rifle for testing, the "debris and oil deposits [were] not holding the connector back" any longer.  (Powell's Dep., at 45.)

Notwithstanding that Mr. Powell did not find any debris or contaminant interference causing a reduced or dangerously low sear engagement, it is Mr. Powell's opinion that a jar-off occurred and killed Mr. Seamon.  Mr. Powell bases his opinion upon the description of the accident, the presence of dirt and lubricant deposits "that have been shown to be sources of interferences for the connector sear engagement," and his review of documents produced by Remington detailing occurrences in historical testing of the "firing of a Remington Arms rifle with a Walker trigger, whose sear engagement has been reduced by interferences."[6] (Powell's Report, at § 6.4; *see also* § 6.10.)

In his report, Mr. Powell also explains that the subject rifle failed the regain test:

> [I]f the trigger is partially pulled and then released, the connector will not return to the full engaged position.  In my examination, I found that the trigger could be partially pulled by hand and left at an Engagement Length of only 0.006", far below the manufacturing standard minimum of 0.020"-0.025".  This value could be found to be even lower through microscopic testing with gradual application of

---

[6] Mr. Powell also served as the plaintiffs' expert in another lawsuit against Remington in the United States District Court for the Northern District of Oklahoma (the "*Gurley* suit").  In the *Gurley* suit, Mr. Powell testified that the Remington Model 700 has an inherent defect from the use of the Walker fire control system.  In that case, he opined that the accident rifle most likely fired without a trigger pull when the rifle's *safety* came in contact with barbed wire, causing the safety to release and the rifle to discharge without a trigger pull.  (*See, e.g.*, Powell's Dep., at 56–57 (*Gurley* case) (Doc. # 34-8).); *see also T.G. v. Remington Arms Co.*, No. 13cv33, 2014 WL 1310285, at *5 (N.D. Okla. 2014) (opinion on summary judgment).

> force.  This very low engagement would allow the rifle to fire from external forces without pulling the trigger.  The measured Sear-Safety Lift Height is appropriate and Connector Overtravel Length very large for this fire control designs [sic].

(Powell's Report, at § 6.5; *see also* Powell's Dep., at 77–79.)   Although Mr. Powell believes that a partial pull of the M700's trigger also could cause a precipitous sear engagement (Powell's Dep., at 76 (*Gurley* case)), Mr. Powell does not indicate in his report whether he believes that a partial trigger pull, as he has described it, is what caused the rifle to discharge.  Nor does he cite any evidence in his report suggesting that the trigger was partially pulled in the manner he describes.  During his deposition in this case, Mr. Powell identified the rifle's failure to pass the regain test as a defect, but as to causation, Mr. Powell was equivocal.  He testified:

> Q.    Are you aware based on your review of all the materials you reviewed in the Seamon case of any evidence that the . . . trigger on the subject rifle was ever partially pulled before the accident when the safety was in the fire position?
>
> A.    I don't know.  It certainly could have been if that's what reduced it to a low engagement, but I have no evidence one way or the other.
>
> Q.    [H]ave you formed an opinion to a reasonable degree of certainty that such a partial trigger pull occurred here in this case before the time of this accident?
>
> A.    I . . . can opine that if that occurred, it would reduce it to a very dangerous state and leave it there.  But . . . I don't have any . . . way of looking at the accident that can tell me which exactly caused the reduction in the engagement.  Something did, but I don't know . . . which mode did.

(Powell's Dep., at 82–83.)[7]  He explained further:

> Q.   [F]or this failure to regain that you found in this gun to have been causally related to this accident, the trigger would have had to have been pulled partially when the safety was in the fire position and then Mr. Seamon did not return the safety to the safe position before attempting to lower or raise the rifle from the tree?
>
> A.   All I could tell you is that at some point the safety would have had to have been in the F position when it was partially pulled, and the safety could not have been moved back to the safe position in order for the regain to be a part of this particular injury.

(Powell's Dep., at 83–84.)

## E.   Claims

On February 11, 2013, Plaintiff filed the operative First Amended Complaint to recover punitive damages from Remington for the wrongful death of her husband, pursuant to Alabama's Wrongful Death Statute, Alabama Code § 6-5-410.  Plaintiff asserts five state-law claims:  (1) Alabama Extended Manufacturers' Liability Doctrine ("AEMLD") (Count I); (2) manufacturer's liability for failure to warn (Count II); (3) negligent and wanton design and manufacture (Count III); (4) negligent and wanton failure to warn (Count IV); and (5) loss of consortium (Count V).  Plaintiff alleges that the design defect in the subject M700 rifle caused the rifle to unexpectedly discharge without pulling the trigger, which resulted in the death of Plaintiff's husband.  Plaintiff alleges that Remington was aware of

---

[7] While Mr. Watkins agrees that the subject rifle fails the regain test, he contends that the failure "was caused by the improper adjustments made to the incident rifle after it left the factory," but that, in any event, "[t]he shooting incident was not caused by any failure to regain." (Watkins's Report, at 14.)

these defects and that it has "exhibit[ed] a complete indifference or conscious disregard for the rights of safety of users and consumers of the rifle and the general public." (Doc. # 20 ¶ 50.)

## IV.  DISCUSSION

This opinion proceeds in three parts.  Part A examines Plaintiff's motion for partial summary judgment, which argues for the application of offensive collateral estoppel.  Part B examines Remington's *Daubert* motion to exclude the causation opinion of Plaintiff's liability expert, Mr. Powell.  Part C discusses Remington's motion for summary judgment, the fate of which hinges on the outcome of the *Daubert* motion.

## A.    <u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff moves for partial summary judgment on the issue of the M700's product defect based on the allegedly preclusive effect of judgments against Remington in three other cases:  (1) *Lewy v. Remington Arms Co.*, 836 F.2d 1104 (8th Cir. 1988), a case tried in the Western District of Missouri; (2) *Campbell v. Remington Arms, Co.*, 958 F.2d 376 (9th Cir. 1992), a case tried in the District of Alaska; and  (3) *Collins v. Remington Arms, Co.*, No. 91-11-10856-CV (D. Maverick Cnty., Tex. 293d Jud. Dist. May 1, 1994), a Texas state court case. Specifically, Plaintiff relies on the doctrine of offensive collateral estoppel.  But

Remington argues that the decisions in *Lewy*, *Campbell*, and *Collins* are distinguishable.  Remington has the better argument.

Collateral estoppel bars re-litigation of an issue where:  "(1) the issue at stake is identical to the one involved in the earlier proceeding; (2) the issue was actually litigated in the earlier proceeding; (3) the determination of the issue . . . [was] a critical and necessary part of the earlier judgment; and (4) the party against whom collateral estoppel is asserted . . . had a full and fair opportunity to litigate the issue." [8] *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1180 (11th Cir. 2013) (citation and internal quotation marks omitted); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (extending the application of collateral estoppel to allow for its offensive use and explaining that the elements are the same whether a party seeks to use the doctrine "offensively" or "defensively"). Notwithstanding federal common law's approval of offensive collateral estoppel, it "should be cautiously applied, and may not be used when its application would be unfair to the defendant." [9] *Ray v. Birmingham City Bd. of Educ.*, 845 F.2d 281, 283

---

[8] An offensive use of collateral estoppel occurs when a plaintiff who was not a party to the first lawsuit seeks to preclude a defendant from relitigating an issue the defendant lost in a prior case.  *Deweese v. Town of Palm Beach*, 688 F.2d 731, 733 (11th Cir. 1982).

[9] The parties do not squarely address the appropriate law governing the collateral-estoppel analysis.  At issue are the preclusive effects of decisions from a Texas state court and two federal courts.  As to the Texas state court decision, Texas principles governing collateral estoppel apply.  *See Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011) ("In considering whether to give preclusive effect to state-court judgments under res judicata or collateral estoppel, the federal court applies the rendering state's law of preclusion.").  As to the two federal-court judgments, federal common law applies.  *See Tampa Bay Water*, 731 F.3d

(11th Cir. 1988). The Eleventh Circuit also has cautioned that offensive collateral estoppel "should not be extended indiscriminately to tort cases where the factual circumstances in each case differ and no hard and fast legal standard has emerged from the developing case law." *Deviner v. Electrolux Motor, AB*, 844 F.2d 769, 774 (11th Cir. 1988).

Although the controlling law permits a plaintiff to rely on offensive collateral estoppel, its application is not warranted here. The *Lewy*, *Campbell*, and *Collins* cases were the subject of a collateral-estoppel analysis in *O'Neal v. Remington Arms*, No. 11cv4182, 2014 WL 993020 (D.S.D. Mar. 13, 2014), and Remington urges the court to reach the same conclusion that the *O'Neal* court did. The *O'Neal* court rejected the same argument Plaintiff makes here, namely, that Remington is precluded from litigating whether the Model 700 rifle is defective based upon the judgments in *Lewy*, *Campbell*, and *Collins*.

In *O'Neal*, the wife and personal representative of the estate of her deceased husband brought a products liability and failure-to-warn action against Remington.

---

at 1179 ("[F]ederal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question jurisdiction."). It appears that there are no material differences in the application of the doctrine of offensive collateral estoppel under Texas law and federal common law, at least insofar as applied in this case; hence, a single analysis should suffice. *See Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 802 n.7 (Tex. 1994) ("Although some of the defendants argue that the federal law of collateral estoppel applies in this case, we need not decide the issue. We perceive little difference between the federal courts' formulation of the doctrine [of collateral estoppel] and our own."). *Compare DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344, 348 (5th Cir. 2001) (observing that Texas law recognizes offensive, non-mutual collateral estoppel), *with Parklane Hosiery Co.*, 439 U.S. at 331 (same).

The husband and a friend, who were on a deer-hunting excursion, stopped the truck to shoot a deer in sight.  The friend moved the safety of the M700 rifle from the "on" position to the "off" position, and it discharged.  The husband was shot and killed.  The *O'Neal* plaintiff moved for partial summary judgment on the issue of product defect based upon collateral estoppel and cited the *Lewy*, *Campbell*, and *Collins* cases to support her argument.  *Id.* at *3–4.  After examining each case, the district court observed that "the issues decided in the *Lewy*, *Campbell*, and *Collins* cases are not identical to the issue presented here or there was not a final judgment on the merits, and thus, whether the particular [M700] rifle in this case is defective was not *actually* litigated in previous cases."  *Id.* at *4.

The court has reviewed *O'Neal*, as well as *Lewy*, *Campbell*, and *Collins*, and finds *O'Neal*'s analysis distinguishing the latter three cases to be persuasive and applicable here.  As the *O'Neal* court explained, in *Lewy*, although the jury returned a verdict in favor of the plaintiffs on a design defect claim that the rifle's control mechanism was susceptible to firing upon the release of the safety, the Eighth Circuit remanded the case for a new trial; hence, the court concluded that the *Lewy* decision did not amount to "a final judgment on the merits."  *Id.* at *3.  *Lewy* does not, therefore, satisfy an essential element of collateral estoppel.[10]

---

[10]   Additionally, it also may be that the issue in this case is not sufficiently similar to that in *Lewy*, although it is not entirely clear from the record or arguments.  As Mr. Powell explains, a jar-off occurs when the safety is in the "fire" or "off" position and "the connector does not support the sear at all," and a jar-off generally is not related to inadequate sear lift.  Mr. Powell

Turning to *Campbell*, the *O'Neal* court explained that *Campbell* involved an M700 barreled action rifle that had undergone significant changes and customizations after it left Remington's possession. *See O'Neal*, 2014 WL 993020, at *3. The *Campbell* jury found in favor of the plaintiff on a products liability claim that the fire control system of the Model 700 rifle was defective because it fired on bolt closure, but as the *O'Neal* court pointed out, the verdict form did not identify whether the defect was a design defect or a manufacturing defect. "Because a manufacturing defect claim involves a specific product, [collateral estoppel] would only apply in later litigation if the lawsuit involved the exact same product." *O'Neal*, 2014 WL 993020, at *3 & n.2. The M700 rifle in this action – as in *O'Neal* – appears to be different from the M700 rifle in *Campbell*, and Plaintiff has not demonstrated the contrary. Therefore, collateral estoppel is inapplicable because the issues are not identical.

Finally, in *Collins*, the M700 rifle allegedly was defective because the safety had to be in the fire position when it was loaded and unloaded, and the rifle did not

---

attributes inadequate sear lift to a defective condition existing when the trigger is pulled while the safety is in the "on" or "safe" position, and the "connector gets trapped in front of the sear ledge," and consequently will "fire on safe release." (Powell's Dep., at 12–13, 16, 27.) The allegedly defective condition in *Lewy* appears to be one of inadequate sear lift, which the court understands that Mr. Powell is not contending existed in this case. (*See* Powell's Dep., at 85 (The subject rifle "appeared to have safe and adequate lift."); *see also* Powell's Report, at § 6.5 ("The measured Sear-Safety Lift Height is appropriate."); § 6.6 ("The measured Sear-Safety Lift Height on this rifle indicates that the two position safety lever, a component of the fire control, was in the ['fire'] position when the rifle discharged. There was no indication that the firing pin head slipped past the sear held upward in engagement by the safety cam when the safety lever was in the Safe position.").)

have a safety feature to prevent the discharge that occurred without a trigger pull when the rifle was being loaded or unloaded.  *See Collins v. Remington Arms Co.*, JVR No. 161125, 1994 WL 866816 (Tex. Dist. May 1994).  Again, as in *O'Neal*, a different issue is presented in this action.  Here, Plaintiff avers that the M700 rifle discharged without a pull of the trigger when the safety was in the off or "fire" position.  Consequently, the defect at issue in the present case was not actually litigated in *Collins*; therefore, collateral estoppel is inapplicable based upon the judgment in *Collins*.  In sum, neither *Lewis*, nor *Campbell*, nor *Collins* provides a basis for applying collateral estoppel in this case.  Plaintiff's Motion for Partial Summary Judgment is due to be denied.[11]

## B.   Remington's Motion to Exclude the Causation Opinion Testimony of Plaintiff's Liability Expert, Charles Powell

There is no dispute that causation is an essential element of Plaintiff's state-law claims.[12]  *See Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 31 (Ala. 2003) (To succeed on a claim under the AEMLD, the plaintiff must prove, among other elements, "that an injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or

---

[11] It is unnecessary to address Remington's other arguments against the application of offensive collateral estoppel.

[12] In this diversity case, Alabama's substantive law governs Plaintiff's burden of proof on causation, but federal law governs "whether the expert testimony proffered to prove causation is sufficiently reliable to submit it to the jury."  *Hendrix*, 609 F.3d at 1193.

consumer." (citation and internal quotation marks omitted)); *see also McClain v. Coca-Cola Co. Distributor*, No. 08cv614, 2009 WL 2985693, at *7 (M.D. Ala. Sept. 16, 2009) (explaining that for claims alleging failure to warn under a negligence theory and under the AEMLD, the plaintiff must prove that the defendant's breach of a duty to warn "proximately caused the plaintiff's injuries"). And in products liability cases, "ordinarily, expert testimony is required because of the complex and technical nature of the commodity." *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 303 (Ala. 2001) (citation and internal quotation marks omitted).

Plaintiff relies upon the opinion of her expert, Mr. Powell, to prove causation, but Remington argues that Mr. Powell's causation opinion testimony does not meet muster under Rule 702 and *Daubert*.[13] Remington contends that, absent Mr. Powell's opinion testimony on causation, Plaintiff cannot establish a prima facie case on any of her claims. There is no dispute that Plaintiff's claims rise or fall on the admissibility of Mr. Powell's testimony.

Remington's arguments for the exclusion of Mr. Powell's opinion testimony on causation fall within two categories. First, Remington contends that Mr. Powell's causation opinion lacks factual support and, thus, rests on faulty assumptions. Specifically, Remington challenges the factual basis of Mr. Powell's

---

[13] Remington does not presently challenge either Mr. Powell's opinion that the use of the connector in the Walker trigger is a design defect or Mr. Powell's qualifications.

testimony either that a partial trigger pull occurred prior to the accident or that lubricant and dirt deposits caused the precipitous sear engagement that allowed the rifle to fire, when jarred, without a trigger pull when the safety was "off" (in the "fire" position).   Second, Remington argues that Mr. Powell fails to rule out alternative, non-defect causes for the shooting.   These arguments, at their core, challenge the relevance and reliability of Mr. Powell's causation opinion testimony.  The arguments are addressed in turn.

### 1.   *Factual Foundation*

Remington contends that Mr. Powell's causation opinion testimony lacks a factual foundation in two significant ways.   First, Remington focuses on the accident scene and the lack of eyewitness testimony or other evidence showing (1) that, prior to the shooting, the rifle's trigger was partially pulled while the safety was "off" (in the "fire position"), (2) how Mr. Seamon was handling the rifle at the time of the shooting, and (3) that an "external force" caused the rifle to discharge without a trigger pull.  Remington contends that the record is devoid of any "information as to where the rifle was located when it discharged, *e.g.*, in Mr. Seamon's grasp, in contact with the tree stand or hunting gear, pressed against the tree, or in contact with the lanyard or its carabiners (any of which could cause inadvertent trigger activation)."  (Doc. # 34, at 16–17; *see also* Doc. # 34, at 19 (contending that this case "is unprecedented in its lack of eyewitness testimony

about how the rifle was being handled at the moment of discharge").)   Hence, Remington contends that there is "no reliable basis to conclude the rifle fired without a trigger pull because of a 'jar-off.'"   (Doc. # 34, at 2.)   Remington also emphasizes that, during Mr. Powell's "own post-incident testing of the rifle, it would not fire without a simultaneous trigger pull" and that "the only way" either Mr. Powell or Remington's expert could make the rifle fire "was by pulling the trigger when the safety was 'OFF.'"   (Doc. # 34, at 17.)

Second, Remington challenges as factually speculative Mr. Powell's "causation opinion that, at the precise moment of the shooting, debris or contaminants had lodged in the trigger mechanism displacing the connector away from the trigger body creating a precipitous sear engagement."   (Doc. # 34, at 13.) Remington says that the type of debris is "unknown" (Doc. # 34, at 7), and points out that, as its expert opines, the x-ray of the rifle revealed that "no debris or contaminants were interfering with the trigger to connector relationship." (Watkins's Report, at 21.)   Additionally, Remington emphasizes that, in post-accident testing of the rifle, Mr. Powell "looked for but found no debris or contaminants interfering with the rifle's safe and secure sear engagement."   (Doc. # 34, at 20.)   Remington also points out that Mr. Powell admitted that he has never seen in accident rifles, including the M700 rifle at issue, "debris or lubricant deposits between the side plates and the connector causing a dangerously low

engagement." (Powell's Dep., at 45.)   In short, Remington contends that the absence of supporting facts renders Mr. Powell's causation opinion "nothing more than speculation and conjecture." (Doc. # 34, at 18.)

Plaintiff contends that there is some evidence to support Mr. Powell's theory that an external force jarred the rifle, causing it to fire without a trigger pull.  She contends that there is evidence to rule out that Mr. Seamon himself pulled the trigger that discharged the fatal bullet.  She focuses on the evidence demonstrating an absence of gunshot residue on Mr. Seamon's clothing and the testimony of an officer and another of Plaintiff's experts, who both concluded that the rifle was at least five feet from Mr. Seamon at the time of its firing.  Plaintiff does not specifically confront, however, Remington's argument, which relies on Mr. Powell's deposition testimony, that he has "no evidence one way or the other" of a partial trigger pull prior to the accident.  (Powell's Dep., at 82.)  Plaintiff also cites Mr. Powell's deposition testimony in which he opines that dirt and lubricant deposits were displacing the connector away from the trigger body, but Plaintiff does not address Remington's argument attacking the alleged absence of facts that on the date of the accident, such deposits caused a precipitously low sear engagement.

"It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Steckyk v. Bell*

*Helicopter Textron, Inc.*, 295 F.3d 408 (3rd Cir. 2002); *Lauzon*, 270 F.3d at 695 ("We would agree that where opinion testimony has no support in the record that it should be excluded."). Stated differently, an expert's opinion cannot be based upon "unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.,* 169 F.3d 514, 519 (8th Cir. 1999) (providing that expert testimony is nothing more than "patent speculation" when there is "no evidence in the record" to support it.), *aff'd*, 528 U.S. 440 (2000); *see also* Fed. R. Evid. 702 advisory committee's note ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted"). And, "[w]here an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *see also* Fed. R. Evid. 702 (expert testimony must be "based upon sufficient facts or data"). For the reasons that follow, Mr. Powell has formed his opinions based upon facts that are not in this record.

<b>(a)</b>   <i><b>No Evidence of a Partial Pull of the Trigger</b></i>

Mr. Powell's testimony that, *if* at some point prior to the shooting, the trigger was partially pulled while the rifle's safety was in the "fire" position, the partial trigger pull could have reduced the sear-connector to an unsafe level, finds no factual support in the record. Mr. Powell candidly admits that he "has no evidence one way or the other" whether the "trigger on the subject rifle was ever

28

partially pulled before the accident when the safety was in the fire position."
(Powell's Dep., at 82–83.)  When directly asked, if he had "formed an opinion . . .
that such a partial trigger pull occurred here," he answered, "I don't have . . . any
way of looking at the accident that can tell me [what] exactly caused the reduction
in engagement.  Something did, but I don't know what."   (Powell's Dep., at 83.)
Additionally, Plaintiff has not pointed to any circumstantial evidence in the record,
or even argued that such evidence exists, from which it would be reasonable to
infer that, prior to the fatal shooting, there was a partial pull and release of the
trigger while the safety was in the "fire" position.  On this factual void, Mr.
Powell's opinion testimony that a partial trigger pull occurred is inadmissible
because it is based upon "unsupported speculation" and, more particularly,
assumes facts that are not in the record.  *Daubert*, 509 U.S. at 590.

### (b)   No Evidence that a Jar-off Was the Precipitating Force

The court turns to whether, on the summary judgment materials, the
inferences arising from the circumstantial evidence would permit a jury reasonably
to conclude that it is more likely than not that the rifle discharged without a trigger
pull, while the safety was "off," as a result of an external force that jarred the rifle
(a "jar-off").  For the reasons that follow, the inference that an external force jarred
the rifle, contrary to Plaintiff's urging, is unreasonable on the scant facts.

Initially, here are the facts from the scene that can be deduced.  Mr. Seamon was found dead in an elevated tree stand with his right hand in a "grasping position," and his rifle, which was in the "fire" position and attached to a lanyard by carabiners, was on the ground some thirteen feet below.  There is, as Plaintiff urges, some circumstantial evidence from which to infer that Mr. Seamon himself did not pull the trigger, namely, the absence of gunshot residue on Mr. Seamon's clothing (a fact leading other witnesses in this case to conclude that the rifle was not within Mr. Seamon's arm's reach when it fired).  There also is some evidence that there was a clear path – free of branches and other physical obstructions – for the lanyard to travel as the gun was hoisted or lowered.  And, it is undisputed that the rifle fired a bullet that killed Mr. Seamon.  So it is assumed, for summary judgment purposes, that Mr. Seamon did not fire the fatal shot and that a hanging branch did not get caught in the trigger mechanism when the rifle was raised or lowered.

These facts, however salient they may be, are not enough to cross the line between unsupported speculation and reasonable inference with respect to whether there was an external force that jarred the rifle and precipitated the firing of the rifle without a trigger pull.  What facts are there that the rifle was subject to jarring from an external force?  Mr. Powell does not say or portend to know how the facts

played out on the day of the fatal shooting.[14]  Is it possible that Mr. Seamon lost his grip on the rope and that the rifle crashed onto the ground?  Is it possible that Mr. Seamon snatched the rope, which jolted the rifle?  Is it possible that Mr. Seamon raised or lowered the rifle with gentle ease?  Is it possible that someone else shot Mr. Seamon with his own rifle?  All of these factual possibilities and any number of others are unanswered by the evidence and, thus, fall within the realm of the unknown.  This goes to show that Plaintiff has not shown how the record supports the inferences upon which Mr. Powell relies for his opinion testimony that this case "may have been a jar off."  (Powell's Dep. 21.)  "May *not* have been" is an equally plausible inference.  Not only is a factual basis missing for his opinion, but Mr. Powell also acknowledges that he was unable to replicate a "jar off" in his testing and inspection of the subject rifle.  (Powell's Dep. 21–22, 29–30.)

### (c)    No Evidence of Dirt and Debris in the Fire Control Housing

Moreover, even if it is assumed that an external force was applied to the rifle, Mr. Powell's theory also requires that lubricant and dirt deposits were so situated within the fire control housing – between the trigger body and connector – as to cause a precipitously low sear engagement.  Mr. Powell concedes that, when he examined the rifle, "debris and oil deposits [were] not holding the connector

---

[14] (*See, e.g.*, Powell's Dep. at 85–86 (stating that he did not know if Mr. Seamon "was raising as opposed to lowering the rifle when this occurred," or "how . . . the rifle [was] situated on the lanyard," and stating that the "only information [he] ha[s] on the accident is from the accident reports").)

back" any longer, and he concedes that in all of his testing of the M700 rifle, he has never seen the condition he proposes existed in this rifle at the time of the shooting.  (Powell's Dep., at 45.)  He only can hypothesize that the debris had fallen out of the rifle between the time of its fatal firing and the time he examined it.  To reach the same opinion as Mr. Powell, however, one must engage in a metaphysical process of conceptualizing that at the exact moment the rifle fired, a sufficient quantity of dirt and debris had accumulated and then lodged precisely in the right location – *i.e.*, between the trigger body and the connector.  In short, Plaintiff has not demonstrated by a preponderance of the evidence that Mr. Powell "sufficiently connected the proposed testimony with the facts of the case." *Lauzon*, 270 F.3d at 687; *see also Weisgram*, 169 F.3d at 519 (holding that an expert on fire cause and origin could not testify that the heater had malfunctioned because his opinion relied "on inferences that ha[d] absolutely no record support" and on his "own unsubstantiated theories").

## 2.  *Elimination of Alternative Causes of the Shooting*

Remington also contends that Mr. Powell fails to rule out "alternative, non-defect related explanations for why the rifle may have discharged," including that the rifle fired because the safety was in the "fire" position and the trigger was pulled.  (Doc. # 34, at 12.)  An expert "must at least consider other factors that could have been the sole cause of the plaintiff's injury" and must "provide a

reasonable explanation as to why he . . . has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury."[15]  *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (internal quotation marks and citation omitted); *see also Borum v. Werner Co.*, No. 5:11cv997, 2012 WL 2047678, at *13 (N.D. Ala. June 6, 2012) (rejecting the expert's causation opinion in a case where the plaintiff alleged a manufacturing defect in a ladder, which collapsed while the plaintiff was on it, proximately caused his injuries, because it failed to "account for other possible, if not probable, causes of the ladder's failure.").

Based upon the foregoing authority, Mr. Powell does not adequately account for the alternative theory that the rifle fired because the trigger was pulled.  His explanation is that he is unaware of "any evidence that the trigger was pulled" (Powell's Dep. at 98), but on this record, the converse equally is true:  There is a lack of evidence that the trigger was not pulled.  The inference that the rifle fired without a trigger pull is no more likely than the inference that it fired with a trigger pull, and the inference is contrary to the evidence in this case that, in post-accident testing, "[t]he only time the rifle fired [was] when we pulled the trigger." (Powell's Dep., at 105.)  For this reason as well, Mr. Powell's opinion that the rifle

---

[15] The factor focusing on the expert's ability to rule out other causes is applied most often "when addressing an expert opinion on causation arrived through a differential diagnosis," *Lauzon*, 270 F.3d at 693 n.7, such as in *Guinn*, but has been applied in other contexts as well, such as in *Lauzon* and *Borum*.

fired without a trigger pull is "speculative, unreliable expert testimony."  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 597).

### 3.   *Summary*

As the foregoing discussion demonstrates, Mr. Powell has little in the way of facts to sustain his opinions on causation.  His causation opinion is not sufficiently reliable or relevant to be admitted under Rule 702 and *Daubert*.  Accordingly, Remington's motion to exclude Mr. Powell's expert testimony and opinion is due to be granted.

### C.   <u>Remington's Motion for Summary Judgment</u>

Remington's summary judgment motion rests solely on the exclusion of Mr. Powell's expert testimony on causation.  (*See* Doc. # 34, at 23 ("Plaintiff's failure to produce admissible expert causation testimony on an essential element of her claim precludes her from making a *prima facie* case.").)  The inadmissibility of Mr. Powell's testimony on causation is, therefore, outcome-determinative of Plaintiff's claims.  Remington's motion for summary judgment is due to be granted.

## V.  CONCLUSION

Based on the foregoing, it is ORDERED that Plaintiff's Motion for Partial Summary Judgment (Doc. # 31) is DENIED, that Remington's Motion to Exclude

the Causation Opinion of Plaintiff's Liability Expert (Doc. # 34) is GRANTED,

and that Remington's motion for summary judgment (Doc. # 34) is GRANTED.

DONE this 29th day of September, 2014.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE